Case number 17-2166, Lewis Rhinehart et al. v. Debra Scutt et al. Oral argument not to exceed 15 minutes per side. Paul Zaleski for the appellant. You may proceed. Good morning, Your Honors. May it please the Court, Paul Zaleski on behalf of Plaintiff Appellant of the Estate of Kenneth Rhinehart. I ask the Clerk to reserve two minutes for rebuttal time. Your Honor, this Honorable Court should reverse the decision of the lower court in granting the defendant's second renewed motion for summary judgment because genuine issues of material fact exist for trial as to whether the defendants, Stevenson and Edelman, were deliberately indifferent to Mr. Rhinehart's serious medical needs. This Court should also reverse the lower court's decision to grant partial grant of a Daubert motion filed by the defendants, limiting certain testimony by the plaintiff's expert, Stuart Finkel, because that testimony is based on sound scientific evidence. Your Honor, the quick answer of why the Court should reverse the lower court's decision is essentially the Court got it right the first time when they denied summary judgment and got it completely wrong the second time. There are utter misstatements of fact in the recent grant of summary judgment by the Court. They reversed findings without explanation. And the actions of the defendants in this case is not a typical case of deliberate indifference. This is a case of conscious and knowing disregard of a well-known serious health risk. When Mr. Rhinehart was transferred to the Cotton Facility in Jackson, Michigan, it was for a very specific reason. In 2009 of September, his doctor, Dr. Burhani at the time, found that he was advancing this liver disease. He had end-stage liver disease, stage 4 fibrosis. It appeared that he was developing to the extent of cirrhosis at this point in time. A surgical consult confirmed the primary concern was his liver issue and recommended a transfer to see a hepatologist and potentially an oncologist because of this new mass that was discovered on his liver. But the primary concern was his liver disease. He arrived at Cotton and nothing happened, not for a week, not for a month, for two months. And then he gets there in late October 2009. In January 2010, his assigned physician, Dr. Stevenson, who was advised in advance by Dr. Burhani of this expedited medical transfer, made no arrangements to receive him. And then in 2010 of January, when it's brought to his attention that Mr. Rhinehart's been sitting in his cell for six weeks and hasn't even seen a doctor yet, he still does nothing. So come the following month, he orders another doctor, because he allegedly was too busy, to go see Mr. Rhinehart instead, and that was Dr. Vermuri. Dr. Vermuri testified she likely didn't even have his medical file at the time. Mr. Rhinehart filed a grievance about that exact issue, saying, I've been sitting here, a doctor finally comes to see me, and they don't even know what's going on. So Mr. Rhinehart still has nothing occur to him as far as medical treatment. None of the specialist referrals that were expressly given to him prior to his transfer are met. And then a newspaper article comes in February documenting the lack of medical treatment. An ACLU attorney, who's one of the counsels in this case, Elizabeth Alexander, contacts the Michigan Attorney General's office, and flurries of e-mails are spawned. Then and only then does Dr. Stevenson see Mr. Rhinehart for the first time. So is that part of your complaint then, the failure to see Mr. Rhinehart during that period, or is your complaint more focused on Stevenson's actions later on? It's both, Your Honor, and that's an excellent point. Because when Mr. Rhinehart first filed this case in pro per, that was the sole focus is that four-month delay, the failure to treat him. There's essentially two different issues of deliberate indifference here, the initial delay in treatment and the failure to see him and expedite his medical referrals, and then everything that occurred after that date when no further action was taken by Dr. Stevenson, when it was known he didn't receive these referrals. End-stage liver disease has very foreseeable well-known complications that are separate medical conditions that every physician knows. And what happens is portal hypertension is caused because your liver is decompensating, the blood pressure in your body is increasing, and it's being forced out through smaller veins. Esophageal varices, which are the small veins in your esophagus, become swollen to the point of near explosion. It's a deadly disease. Dr. Burhani, the one who transferred Mr. Rhinehart, recognized that right away. She also recognized that he did not have any endoscopy scoping to detect if these were to be in place, if there was any varices that were forming. And as a result, Mr. Rhinehart had absolutely no treatment for that very well-known high risk of harm that could have caused him death. But he did ultimately get treatment for the varices? Only on an emergency basis, Your Honor, yes. When he was double odor and pain in October of 2010, that's the very first time he was, I'm sorry, June 2010, that's the very first time he was ever sent to go to the hospital. And after he was discharged, I'm sorry, Your Honor. It was June, okay, you just said. Yeah, June. And after he was discharged, the instructions were, unremarkably, he needs to be monitored by a gastroenterologist, he needs to be monitored by a GI, because these are going to likely reform if they're not closely monitored. He also needs to be put on the supplemental medication to help reduce the blood pressure. But you're not appealing Cohen, Dr. Cohen's determination, right? Because when he came back, Dr. Cohen saw him and made a different medical determination. Well, she actually didn't make a different medical determination, Your Honor. Dr. Cohen merely followed Dr. Schesinger's recommendation to prescribe beta blockers but ignored the rest. To me, that's a different medical determination. She said that I'm going to prescribe beta blockers and not refer him to a gastroenterologist, right? And that's part of your beef, and yet you didn't appeal Cohen's dismissal from this lawsuit. Dr. Cohen was never part of the lawsuit, Your Honor. Oh, well, then you didn't sue Cohen. That's right. When the case was started, the defendants were already named. I was brought in as an attorney midway through the pro per litigation. Okay, but Cohen made that determination, right? And the case law is pretty clear. It's proper for other doctors to rely upon a medical determination made by a doctor. Well, first of all, we're not dealing with just another doctor. We're dealing with a specialist who's an expert in the field. And a disregard of the only known way to detect these varices and treat them is completely deliberately indifferent. And Dr. Stevenson, based on all the testimony who's- I thought there was evidence that the beta blockers do work. Well, beta blockers are a supplement to the treatment. And Dr. Schesinger and Dr. Finkel and all the medical literature I provided to the lower court and cited in the briefs support that that's a secondary treatment. The scoping is what is needed. Beta blockers can't detect these varices from forming. And I think the court really needs to take notice that the hum, which is- Can I go back just a quick? So Cohen sees him. Is there any evidence in the record that Stevenson was aware and read Schesinger's recommendation? There's abundant evidence that he was made aware after Mr. Reinhart's return that there were issues going on. Well, no, no, no. So I'm asking a different question. I understand there's issues. There were issues going on the entire time. I think you've made that pretty clear. Was he aware of Schesinger's recommendation that he see a gastroenterologist? Because you're showing Stevenson, not Cohen, as we've just discussed. We know Cohen was aware of it because Cohen made the medical determination to prescribe beta blockers rather than the gastroenterologist. Did Stevenson know? He had to have known, Your Honor. I'm not asking whether he had to know. Give me the evidence from which we can conclude he actually knew. Dr. Stevenson was his assigned physician. And under Farmer, ignoring your job duties and responsibilities doesn't insulate you from deliberate indifference. You can't just simply turn a blind eye. So the answer to my question is there is no evidence. Not direct evidence that he read the report. There's no testimony to that effect. However, he's being advised by nurses after Mr. Reinhart's return that he's having these episodes of shortness of breath, which is, of course, indication that he's not receiving the beta blocker medication well because he had asthma, which is a relative contraindication to that. But I think the court really needs to take note in the fact that the HUM, who's the highest MDOC medical agent at that facility, Beth Garden, unequivocally testified Dr. Stevenson was his assigned physician. Physicians at that facility were assigned based on the inmate's number, the inmate number range. Not only was that confirmed by the HUM, but Dr. Vermuri, who repeatedly called Dr. Stevenson her boss, stated right in her report that this is Dr. Stevenson's patient that I'm seeing here today because he ordered me to see him. So how long was Stevenson then at the prison? He left the prison in August of 2011. 2010. 2010, yes. Okay, so your focus then is on this period, essentially six- to eight-month period that Stevenson was involved. That is correct. Now, you also have Edelman. Yes, and with regards to Dr. Edelman, there was a lot of troubling behaviors on his part. This is the individual in Utilization Management for Carize and the private company whose sole job is to serve as the gatekeeper. When treating physicians want a specialist, because there are no specialists in the prison, they have to go to an outside facility. Dr. Edelman is the one who approved the expedited medical transfer for Mr. Reinhart in the beginning. And then in February of 2010, when it's brought to his attention through the series of e-mails with the MDOC and other medical officials that Mr. Reinhart never received any of these referrals, he does nothing to follow up on that. Now, later on, as time goes on and Dr. Stevenson's gone, Dr. Edelman starts to become more intimately involved in Mr. Reinhart's care, which is rather uncharacteristic. He's almost stepping out of his role as an administrator at this time. In August of 2011, Mr. Reinhart was complaining of being in constant pain, eight out of ten. Dr. Edelman then, in August 6, 2011, and this is at ECF 315 at page ID 7781, discontinues Mr. Reinhart's pain medication. A few days later, on October 12th, he has a telemed conference with Mr. Reinhart where his severe cirrhosis, his abdominal pain, the distension, all the conditions that indicated he needed medical treatment by a specialist to begin with are now resurfacing. Dr. Edelman says, you're not in pain. This doesn't cause you any pain. And what happens a few days later? Of course, his inmate watches him vomit a liter of blood in his cell, as his esophageal varices rupture. He's rushed to Allegiance Hospital again, and this time the same doctor performs a second series of emergency banding and says, this is it. I cannot perform any more banding. He needs to have this TIPS procedure, and what a TIPS is, as the court, I'm sure, is aware, it's a surgical shunt that's placed in the liver to reroute the flow of blood, and that does multiple things. It eliminates portal hypertension, which causes the varices from forming. It eliminates the formation of ascites, which, of course, causes the abdominal distension and pain, and all the medical literature supports it drastically improves their quality of life. Dr. Edelman denies it. During his deposition testimony, he can't even identify how the procedure is performed, let alone acknowledge that it is a noninvasive, generally an outpatient procedure. After that procedure, he suffered no more bleeding, correct? That is correct. He did not suffer any more bleeding. Wasn't there an alternative that was prescribed for him? No, there was not. There was continuation, of course, of beta blockers intermittently, but Mr. Reinhart couldn't tolerate them very well. But he did continue to have the ascites, didn't he? Absolutely. Is there any evidence that the TIPS procedure would have handled the ascites any different than the beta blockers? Well, beta blockers don't prevent the ascites from forming, or beta blockers help reduce the portal hypertension that causes varices from forming, but that is a secondary treatment. And the testimony from Dr. Schasinger and Dr. Finkel, the expert, both go directly to that point, that EGD scoping is the gold standard of treatment. That's what must be. They don't have to give the gold standard, right? If they give adequate medical treatment, that's the standard. It's not the gold standard. I think the Supreme Court has been pretty clear about that. Yes, Your Honor, but there was no other way. You can't see varices from forming without scoping them. It's not going to be detected by an X-ray. There's no medicine to prevent them. It has to be monitored, which is why it happened twice, of course. But your argument here is on the TIPS procedure. Yes, that's correct. The TIPS procedure would eliminate the ascites, and the ascites are causing pain, and he's in significant pain that is not being remedied by the pain medicine. There is no question, Your Honor. And also, all the medical literature supports it not only improves your quality of life, but prolongs your life. And Dr. Finkel testified that based on his MELD scores at the time, Mr. Reinhart very well could have lived for another five years. I see my time is up, Your Honor. Thank you. Good morning, Your Honors, and may it please the Court. My name is Kevin McQuillan, and I represent the defendant appellees, Dr. Stevenson and Dr. Edelman, in this appeal from the Eastern District of Michigan. Your Honors, as you're all aware, this is a case about deliberate indifference to serious medical needs, something that this panel is very familiar with. Unlike many other deliberate indifference cases that this panel and this Court have faced in the past, this is a collection of discrete events throughout the course of this man's incarceration that have given rise to these various claims. Each claim must be addressed separately, and Dr. Stevenson and Dr. Edelman cannot be held vicariously liable for the acts or omissions of other doctors or medical providers, and that, of course, is the Garrison case and the Gibson case from this Court. Your Honors, there are two events in particular that need to be analyzed under the obviousness test under Blackmore. Those are the two occasions where Mr. Reinhart received treatment for esophageal varices. The first time was in June of 2010. He had no bleeding prior to this episode. He had abdominal pain, and generally, speaking frankly, he just didn't quite look right, so he was sent to the emergency room for an assessment. An MRI revealed esophageal varices. Dr. Sossinger confirmed the esophageal varices by scoping, and then he immediately changed the instrumentation on the scope and implemented the bands. He made recommendations for a beta-brocker, propanolol, that Dr. Cohen received, as Judge Thapar pointed out, and implemented. Dr. Stevenson cannot be implicated for that decision-making. My understanding is that the complaint regarding Stevenson is that he did not send Reinhart to a specialist after the scoping and banding procedure and the recommendation that Reinhart be sent to a specialist. Respectfully, Judge Moore, I believe that's slightly out of order. My understanding is that the specialist referral that plaintiff challenges from the outset, when he was first transferred to the Cotton Correctional Facility in Jackson, Michigan, is actually what he's going after. If he's steadfast in his questioning of Dr. Stevenson's actions after June 2010, they're simply misplaced. There can be no vicarious liability. If they wanted to sue Dr. Cohen, they had the ability to do that, and they chose not to, and now they're stuck with that choice. So you're saying that after June 2010, there's no direct action or inaction by Stevenson, and it's only vicarious supervisory liability? Yes. As it comes to plaintiff's claims, there's no direct involvement. The only involvement he had— So wait. Stevenson leaves in August of 2010, right? Yes, Your Honor. But in theory, too—and I'm sorry to use the numbers. It's easiest for me. In theory, too, I thought their claim was that Stevenson ignored Schockinger's instructions. I understand I went back and forth with him on Cohen. But their claim—and he answered me and said, under Farmer, he can't just totally neglect doing his duties. So their claim is, Stevenson, as I understand it, neglected doing his duties between June and August by not reviewing Schockinger's medical report and thus not seeing the gastroenterologist's referral. So that's different than the earlier recommendation. Correct, Your Honor. And as you pointed out in your questioning, and as is pointed out, this actually answers two parts of this case. The deposition testimony of Dr. Steve, who at the time was the chief medical officer for the MDOC, and as well as Beth Garden, what is called the health unit manager—she's the head nurse— both of their testimony shows that it is the MDOC nurses who are sort of this intermediary between outside medical care or the custody of the inmates and the Corizon medical providers. That if a patient needs to be seen, if they're new to a facility, the nurses conduct intake, and the nurses make a determination about follow-up appointments with either providers or to make sure that outside appointments that have already been arranged are rescheduled appropriately for the new location. And the same thing goes towards the June 2010 issue. When he comes back from the facility, the very first person to lay eyes on those documents is the nursing staff. From there, it's referred to the provider who has been providing treatment to the patient. Of course, there's evidence in the record that technically Stevenson was the assigned provider for this individual. But the evidence also shows that that cannot be refuted. There is no question of fact that Dr. Cohn, Dr. VanMurray, Dr. McGuire, and several other medical providers were providing day-to-day follow-up care, were implementing a treatment plan, following a treatment plan. Dr. Cohn is the one that received those instructions, reviewed them, and made a medical judgment determination of what should happen next. So you're asserting that there's no evidence that Stevenson received the recommendation from Schlackinger? Correct, Your Honor. And that there's no direct evidence, and there's no reason to infer that Stevenson would have received that, even though Stevenson was the doctor who was the assigned doctor and the responsible doctor, you might say? On paper, exactly right, Your Honor. At the end of the day, Dr. Cohn received this information, and this is something that's distinguishable from Terrence v. The Northville Psychiatric Hospital, and several cases like it where someone has a duty to fulfill a policymaker job or a policy writing job or receives grievances. Is there any evidence as to why any of the doctors who were involved did not send him to a specialist and have the further scoping? And you're speaking directly about between June of 2010 and October of 2011? Right. Well, what I'm trying to figure out is whether this is a situation where Stevenson would be expected to be aware of what is going on. So conceivably, I'm just making up something. Somebody like Stevenson could say to the lower-level doctors, who I assume Cohn and the others were, we don't want to spend any money, don't send anybody to a specialist. Well, two things, Your Honor. First of all, that didn't happen. And second of all, something that plaintiffs or, sorry, that the Reinharts gloss over in their arguments both to the lower court and to this court is that Mr. Ryan actually saw a GI specialist between June of 2010 and October of 2011. In June of 2011, Mr. Reinhart was sent back to Allegiance Hospital. He had more abdominal pain, and again, to put it frankly, he wasn't looking well. He was sent out to the emergency room for an assessment. A doctor there assessed him in the emergency room and referred him to the GI specialist, Dr. Youssef, at Allegiance Hospital. Dr. Youssef had the same opportunity as Dr. Sausinger to make recommendations, to do EGD scoping, to do other things. He chose not to. He made a medical determination, and he, like the other Allegiance doctors, are not subject to this suit. That fact shows that when he needed follow-up care, he received it. And they cannot show, verifying medical evidence, that any alleged delay or inadequacy caused harm. And the simple fact of the matter is there is no evidence in the record that shows that earlier scoping, earlier banding, or some other series of events would have completely prevented the June 2010 banding, the October 2011 banding, or his subsequent death. Can I ask you a different question, which is on the first theory and third, I guess? They sent, Burhane sends him there to see a specialist, in essence, because she discovers the mass on the liver. Yes, Your Honor. So did they have no obligation, then, to send him to a specialist at that point? This is another point in plaintiff's, or in the Reinhardt's briefing, that glosses over what really happened in the record, something that they cannot refute. When the 2009 CT scan revealed some sort of mass or blockage in the bile ducts between Mr. Reinhardt's liver and his gallbladder, there were lab tests that were done between September, October, and January, and there may actually have been more than that, that measured Mr. Reinhardt's alkaline phosphatase. That lab measurement goes up and up and up as a blockage continues to exist in the bile duct. If the blockage goes away, the alkaline phosphatase goes back down. Those lab results from those months in the time leading up to the January 2010 appointment with Dr. Vermuri indisputably show that the alkaline phosphatase for Mr. Reinhardt went back down to normal levels. And we know in hindsight, am I correct, that he never had cancer? That's absolutely right. Back at that time period in late 2009-2010, they believed he had what was called a klatskin tumor, this bile duct blockage. Later on, they thought he had a heptocellular mass on the actual liver body. But there's no doubt that he has end-stage liver disease. Correct, Your Honor. There is no dispute that he had hepatitis, that he received interferon treatment. He failed that treatment, unfortunately. And as this Court is well aware from prior cases on hepatitis C, you can't simply continue interferon indefinitely. That could seriously harm the patient. It must be stopped if it's proven ineffective. We focused on Stevenson, and I think, given your limited time, we should address Edelman as well. Edelman essentially fails to refer him for the TIPS procedure. My understanding is that is the basic claim regarding Edelman. Your Honor, yes. And I would only point out that the idea here is that Dr. Sostinger made a recommendation that shows indisputably in the evidence, if he has additional bleeding, he needs to be evaluated for a TIPS. The hospitalist, sort of like a game of telephone, got the message slightly altered. He said he needed to have a TIPS and got very upset with Dr. Edelman and Dr. Steve about their medical judgment that disagreed with that recommendation. At the end of the day, what ended up happening was Dr. Steve and Dr. Edelman had a conversation. Dr. Steve's note, made contemporaneous with that phone call or shortly thereafter, explains that we understand the risk. We understand the risk of the re-bleed. We understand what Dr. Sostinger is saying. Did he ever re-bleed after that recommendation? No, Your Honor. He passed away, I believe, in 2013 after hip surgery, complications from hip surgery. So even though he arguably needed the TIPS, it made no difference? Is that right or am I missing something? That's correct, Your Honor. What about the ascites? I don't know if I'm pronouncing that right. But my understanding is that the portal hypertension causes ascites and that the TIPS would relieve the portal hypertension and the ascites. And there's no doubt that he had ascites where he had huge quantities of fluid removed. Your Honor, the record shows that on several different occasions, Mr. Reinhart had ascites and that ascites was drained with a parasitis, I believe is how it's pronounced, a procedure. I believe on one occasion 450 milliliters were removed. That is actually not a significant amount. Prior case law from the Sixth Circuit has identified situations where over three liters were removed from an inmate's abdomen in the past. And in those situations, this Court has not found a limit. What case is that? I believe that's in the several pro se cases where it's like orders. But I believe that there's, first of all, House v. Hickey out of the Eastern District of Kentucky. That's Chief Judge Caldwell's decision. That's unpublished at 2011 U.S. District Lexis, 1621-7. That's a district court. Right. Then there's two from the Federal Appendix. Johnson v. Million, 60 Federal Appendix 548, 2003. And Edmonds v. Robbins, 67 Federal Appendix 872, 2003, which I believe Chief Judge Caldwell from the Eastern District of Kentucky referenced in her rather well-thought-out decision-making on whether or not a disagreement with the recommendation for interferon treatment would give rise to a problem. Can I go back? So they made a determination, what you're saying, a medical determination, that paracetamol, I'm not going to pronounce it right, but draining was better or was sufficient versus tips. Correct. And that goes to the second half of addressing Judge Moore's question, that the tips procedure, like so many things in the field of addressing hepatitis C, have changed rapidly over the years. Unfortunately, Mr. Reinhart died before the availability of Harvoni, something that's totally changed the landscape of hepatitis C treatment. But back at that time, during the relevant time period, tips procedure was new. It was not as effective as it is today. Shortly after Mr. Reinhart's death, medical literature that plaintiffs submitted shows that the tips procedure became much more efficient, effective, and safer to implement. But at that time, it had something like a 60% effectiveness. It may not work at all. It's like the body may not accept it. What was the draining paracentesis? What was that effectiveness? That's completely effective. If you have ascites, it's the buildup of fluid in the abdomen, and if it's drained, it goes away. It's as if you have an orthopedic knee injury and you have swelling. A doctor may drain that swelling. But the tips prevented the ascites from forming or the liquid from pooling or whatever, and the problem of the pain that he had during this period would have been alleviated as opposed to saying, well, wait until you have enough pain, and then we'll see if you have enough ascites, and then we'll do the paracentesis and drain it. Judge Moore, two points to address your question. First of all, the record reflects that at various times throughout the course of Mr. Reinhardt's incarceration, he was given a variety of pain medications, from Ultran to methadone to morphine. So the idea that he went without pain medication, there are moments where pain medication was stopped, but that was based on the circumstances at that time. As far as it goes with ascites and tips, at that time, the tips was designed to potentially reduce the recurrence of ascites. It would not completely eliminate it. The record reflects that Mr. Reinhardt may have still had ascites, may have still had esophageal varices develop, even with a tips procedure. That fact is reflected in the decision-making of Dr. Steve's note and Dr. Edelman's comments both during his deposition in the medical record and Dr. Steve's deposition testimony. So for these foregoing reasons, Dr. Stevenson and Dr. Edelman respectfully ask that this honorable court affirm the judgment of the lower court. Thank you. Thank you. Cancer has never been the issue with Mr. Reinhardt, and he made that very clear in grievances. Defendants like to talk about the cancer issue because he didn't have cancer, but that was never the concern. It was always his end-stage liver disease that was diagnosed and known about. You agree the first referral was about cancer, correct, by Berhain? Oh, no, it was not, Your Honor. And if you look at the recommendation from Berhain, it was for a hepatologist and an oncologist referral. Now, a hepatologist is a liver specialist, and she indicates on the record, Dr. Edelman approved both of those. If you look at the referral to the surgeon, Dr. Kenyon, Dr. Kenyon makes it very clear that the primary concern is his liver and possibly he needs an oncologist referral, so he referred him to a liver specialist and possibly an oncologist. Berhain adopted those and asked for those two specific referrals. None of them occurred. Was this because he had the hepatitis and that the interferon hadn't worked at that particular time? Yes, and that's another. Hepatitis wasn't the issue either. The fact that he failed hepatitis treatment is just even more of a red signal that he needs to be monitored for the formation of esophageal varices because now his liver is decompensating to the point of cirrhosis. Also, contrary to what defense counsel represents, if the court looks at all the medical literature that was cited to the lower court and also cited in our briefs, TIPS was not new in 2011. TIPS was a well-established procedure by that time that was gaining more and more popularity and was recognized to have incredibly good results. And Dr. Finkle testified, based on Mr. Reinhart's medical records, that he would have a very excellent chance of receiving the TIPS procedure and living for another five years at least, even without a liver transplant, which is, of course, the only curative form of end-stage liver disease. Your Honor, the lower court erred when granting defendants second motion for summary judgments. There are ample issues of material fact here for trial as to both defendants. We ask this honorable court to reverse the decision as well as reverse the decision on Dr. Finkle's Daubert motion. Thank you. Thank you both for your argument. The case will be submitted. And would the clerk adjourn court, please?